James E. ROBINSON, Appellant,

v.

The CHARTER OAK FIRE INSURANCE COMPANY, Appellee.

No. 5704.

Court of Civil Appeals of Texas, Waco.

May 26, 1977.

Rehearing Denied June 16, 1977.

George Clark and Tom L. Ragland, Clark, Fisher, Gorin, McDonald & Ragland, Waco, for appellant.

Wade Hutto, Naman, Howell, Smith, Lee & Muldrow, Waco, for appellee.

## OPINION

JAMES, Justice.

This is a workmen's compensation case. Plaintiff-Appellant James E. Robinson brought this suit against Defendant-Appellee Charter Oak Fire Insurance Co., his employer's insurance carrier, for workmen's compensation and doctor's bills growing out of an injury suffered by him in the course of his employment on July 28, 1975. At the time and on the occasion of such injury, Plaintiff was employed by King Tire Sales, Inc. in Waco, Texas, as a tire changer. He sustained a back injury while loading a heavy tire mounted on the rim into the body of a pickup truck. The tire and rim weighed about 120 pounds. Plaintiff alleged total and permanent disability.

Trial was had to a jury which found: (1) Plaintiff received an injury on or about July 28, 1975; (2) in the course of his employment by King Tire Sales, Inc.; (3) such injury was a producing cause of total disability; (4) which began on July 28, 1975; (5) that such total incapacity was temporary; (6) and continued for fifteen weeks; (7) in answer to Special Issue No. 7, the jury failed to find that such injury was or will be a producing cause of any partial disability.

Pursuant to and in harmony with the jury verdict, the trial court entered judgment finding that Plaintiff was entitled to total temporary disability benefits in the amount of $70.00 per week for fifteen weeks plus $130.25 worth of doctor bills. The judgment further recited that the Defendant insurance carrier had already paid Plaintiff for the fifteen weeks' compensation, and therefore entered judgment in favor of Plaintiff against Defendant for the $130.25 and costs.

From this judgment Plaintiff-Appellant Robinson appeals on a single point of error; to wit, that the jury's answers to special issues numbers 5, 6, and 7 are so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. As stated above, by these answers the jury found (5) that the total incapacity was temporary, (6) that it continued for fifteen (15) weeks, and (7) the jury failed to find that Plaintiff's injury was or will be a producing cause of any partial incapacity. We sustain this point of error and thereby reverse and remand the cause for retrial on the merits.

In passing upon this point of error, we have carefully reviewed the entire record and weighed the evidence in support of and contrary to the jury's findings in question, as we are obliged to do. *In re King's Estate* (1951), 150 Tex. 662, 244 S.W.2d 660.

Plaintiff Robinson was thirty-eight years of age at the time of trial. His testimony may be summarized as follows: On the morning of July 28, 1975, while working for King Tire Sales as a tire changer, flat fixer,

and repairman, he was loading a heavy tire mounted on a rim into a pickup truck, when he felt something pop on the left side of his lower back. He at once developed a severe pain in his back which covered the area from his head down to his tailbone. He said, "It felt like a bone broken," and for about five minutes he "could not breathe good," he remained standing at half bend for a while, and then sat down for about ten minutes. The injury was reported to Jerry Ponder, the owner and general manager of King Tire Sales, who in turn got a medical appointment for Plaintiff to see Dr. Wilson Crosthwait, the insurance carrier's doctor. The accident occurred about 8 A.M., Mr. Ponder told Plaintiff of the medical appointment about 9:30 A.M., and the appointment with Dr. Crosthwait was set up for 2:30 P.M. that same date. Plaintiff was driven to the doctor by another employee of King Tire Sales in a company vehicle. Dr. Crosthwait listened to Plaintiff tell of the accident and where he hurt, and then felt around on him and then called Dr. R. K. Gassler's office and set up an appointment for Plaintiff to see Dr. Gassler, an orthopedic surgeon. The earliest an appointment could be had with Dr. Gassler was two days later, July 30, 1975. Although Plaintiff testified he was in pain at the time, Dr. Crosthwait did not give him any medicine.

Plaintiff complained to Dr. Gassler that he was "hurting all over." Dr. Gassler prescribed medications for Plaintiff, had X-rays made, and gave him heat treatments (diathermy) in his office. These diathermy treatments were administered to Plaintiff for three weeks, after which Plaintiff was sent to physiotherapy at Providence Hospital. This physiotherapy consisted of Plaintiff being placed on a stretch machine with weights. These treatments were very painful to Plaintiff over his entire spine with the principal location of the pain being in his lower back where he experienced the popping sensation at the time he lifted the tire. These physiotherapy treatments were administered to him for about three to four weeks. Dr. Gassler also gave Plaintiff an elastic belt to support his back. Plaintiff took the medicine prescribed by Dr. Gassler, wore the back brace which Dr. Gassler gave him, went for the physiotherapy as directed, and did everything Dr. Gassler told him to do. However, none of these things Dr. Gassler prescribed gave Plaintiff relief from his pain.

Plaintiff testified Dr. Gassler told him after examination of the X-rays; "I see something in your back, but whatever it is you'll have to live with it the rest of your life. He didn't say. He said, it was something, looked like a broken bone but he didn't say it was broke all the way. But whatever he said it was, I had to live with it."

While Plaintiff was still under the care of Dr. Gassler, for reasons not shown from the record, the insurance company called Plaintiff and requested him to go for examination to Dr. Stephen Goldberg, a neurological surgeon. Plaintiff testified that he did not know Dr. Goldberg, and had never heard of him before, and that he had made no complaint to anyone about Dr. Gassler or his treatments.

In compliance with the insurance company request, Plaintiff saw Dr. Goldberg at his office on November 5, 1975. Dr. Goldberg saw Plaintiff only this one time, for a period of some 30 to 45 minutes. Plaintiff told Dr. Goldberg that he was under the treatment of Dr. Gassler, and told him about his injury.

Plaintiff testified that Dr. Goldberg felt around on his back, stuck some pins in his legs and back, had X-rays made, and then told Plaintiff he could not find anything wrong with him, and that he would be able to go back to work. Plaintiff told him he was not able to work. According to Plaintiff's testimony, Dr. Goldberg told Plaintiff he could "take a myelogram and could tell me what was wrong with me"; however, Dr. Goldberg took no myelogram. Plaintiff testified he had no idea what a myelogram was, and Dr. Goldberg did not explain to him what it was. Plaintiff's testimony with reference to the myelogram was not controverted by Dr. Goldberg, who testified as a witness for the Defendant.

Plaintiff testified that after he had seen Dr. Goldberg, "my pain was still severe in the lower back and I would walk a little bit and I would get stiff and I would get numb in the legs, so after that I started to go back to Dr. Gassler."

Plaintiff said he went back to Dr. Gassler in accordance with an appointment previously made, and when Dr. Gassler learned the company had sent Plaintiff to Dr. Goldberg, Plaintiff testified Dr. Gassler became upset and angry: "he told me he wasn't going no further because he figured the Insurance Company didn't do him right because they sent me to the Insurance doctor and he wasn't going to have nothing else to do with it." At that time Plaintiff had some medicine that needed to be refilled, and Dr. Gassler refused to refill it. Dr. Gassler refused to give Plaintiff any more treatment or medicine, and made no suggestion of any kind to Plaintiff as to what to do about further medical treatment. Plaintiff testified that at this time he was not able to work, that he was having a lot of pain and numbness in his legs, and that when he sits for a long time, he feels numb and his feet start hurting.

After this last visit to Dr. Gassler, which occurred on November 17, 1975, the Defendant insurance company never furnished Plaintiff any more medical treatment of any kind, that is to say, no medicines, therapy, or a doctor. Moreover, the Defendant without giving Plaintiff any notice or reason, stopped paying Plaintiff compensation at the end of fifteen weeks, as of November 10, 1975. In other words, the company commenced paying Plaintiff $70.00 per week beginning July 28, 1975, the date of injury, and paid him for fifteen weeks until November 10, 1975.

Not having any further medical treatment and not having any compensation or any other income, Plaintiff testified he still needed medical care and treatment. His attorneys sent him to Dr. V. A. Kelley, an osteopathic physician, on February 5, 1976. He was under the care of Dr. Kelley for about six months immediately prior to trial, being last seen by Dr. Kelley on August 5, 1976. The trial commenced on August 9, 1976. At the outset, Dr. Kelley examined him and sent him to Dr. Wybourn, a radiologist, for X-ray examination. Dr. Kelley treated him, applied heat and a vibrating machine to his back, and had him to walk each day. However, Plaintiff testified that he got only temporary relief, and the pain and disability continued; that as of the time of trial he still had severe pain in his lower back, stiffness after walking, and numbness in his legs; that it affects him sitting for a long period of time, causing him numbness and hurting of the feet; that he has trouble sleeping, and is only able to sleep on his stomach; that he has such stiffness in the morning that it is hard for him to move; that if he stoops or twists, he feels severe pain; that when he twists his body he feels the movement of the bone in his back with a pulling and grinding feeling like bone rubbing against bone.

Plaintiff further testified that he had not worked since the date of his injury, that other than the 15 weeks compensation paid him, that he has received no income from any source since the time of his injury, and that he has not been since the date of injury nor at the time of trial able to do any kind of work.

Dr. Kelley testified that from his examination of Plaintiff and the X-rays made and interpreted by Dr. Wybourn, Plaintiff had an anterior arthritic spur on his fifth lumbar vertebra, as well as a congenital anomaly, to wit, the transverse process on the right side was incorporated into the sacrum (tailbone), so that Plaintiff has only four lumbar vertebrae on the right side, but five lumbar vertebrae on the left side. Also, the X-ray showed a sclerosis along the mid-portion of the right sacroiliac joints. Dr. Kelley testified to the following diagnosis: that Plaintiff had suffered ligament damage in the lumbosacral and sacroiliac area on the left side with numbness into the legs indicating disc involvement in the lumbar area; that he was disabled from doing the usual and ordinary tasks of a workman, that this condition had existed since the date of his injury, July 28, 1975, and that in

his opinion his disability was permanent. Dr. Kelley further testified that the history given him by Plaintiff was confirmed by his objective findings.

Dr. Wybourn, the radiologist, testified as to what the X-ray pictures showed that he made at Dr. Kelley's request, and corroborated Dr. Kelley's testimony concerning the bone structure of Plaintiff's back.

Dr. Gassler testified by way of written interrogatories to this effect: That he first saw Plaintiff on July 30, 1975. When asked to describe in detail what tests he performed and examinations made with regard to Plaintiff's complaints, Dr. Gassler answered: "I don't know that I could give in detail the tests performed, other than the usual tests that I give anyone who is complaining of back pain, and those have been commented on in my notes which I have given the court reporter. I believe the notes are self-explanatory." He also testified to the congenital anomaly in Plaintiff's back as above referred to in Dr. Kelley's testimony, wherein the L–5 vertebra is joined to the sacrum; however, he said this was a minor defect which in his opinion would not hinder Plaintiff's movement nor make him more susceptible to low back injury, nor to ligament damage. Dr. Gassler testified that "I did feel he (Plaintiff) had pain in the left lumbosacral region," but that he had no opinion as to why Plaintiff did not respond to physiotherapy.

Dr. Gassler's opinion as to Plaintiff's condition may be summarized as follows: "I felt this patient was reluctant to give up his back pain, and I could not make up my mind whether this specific alleged injury of 7–28–75 was the cause of his back pain. The only diagnosis I could put on this man was probable low back pain reluctant to get well." Also, "I could not give any prognosis on this patient because my last notes were that on 10–29 he was doing fine, but it was suggested he go to see a neurosurgeon, and my last notes were that he came to see me on November 17th telling me that he was still hurting, and at that time it was my opinion that since he had been sent to another doctor that I was no longer his

doctor, and that I suggested that he see the insurance company to find a doctor to take care of him." When asked what his opinion was with regard to whether or when Plaintiff would be able to go back to work, Dr. Gassler replied: "I could not give any medical probability on this patient, because he at no time showed any definite signs of trying to get well, or getting well, and I don't believe that this was particularly due to a specific problem or a specific injury." When asked what his opinion was as to whether he was totally and permanently disabled when he examined Plaintiff, Dr. Gassler's answer was: "If a man persistently stays on crutches and persistently complains of pains in the low back, then he is disabled. His disability is difficult to evaluate because of these factors."

Dr. Gassler further testified that on August 1, 1975, when he saw Plaintiff, he told Plaintiff to stay off work and have diathermy daily, and at that time he was of the opinion that Plaintiff was unable to work. Significantly, the last time Dr. Gassler saw the Plaintiff was on November 17, 1975, nearly nine months before the trial which commenced on August 9, 1976, and he admitted on cross-examination that he does not know anything of his own knowledge about the present condition of Plaintiff.

Dr. Goldberg, a neurological surgeon, testified that he examined the Plaintiff on November 5, 1975, at the request of the Defendant Insurance Company, at which time Plaintiff was complaining of pain in his low back primarily on the left side. Dr. Goldberg testified that he performed what was considered a standard neurological evaluation upon Plaintiff, and when asked to give his opinion, stated: "As far as I was able to determine, on the basis of what I found at the time of the examination and the history he gave of how he was injured, it would be my opinion that he may have sustained some ligament or muscle injury at the time of his accident but I would have expected that this would have resolved itself, cured itself by that time. He did not have any evidence of any kind of nerves that were not working or pinched." He

further testified that he thought Plaintiff would have been able to perform a lot more tasks than he said he was capable of; that he saw no evidence of any type of disc problem or nerve root impingement problem. However, Dr. Goldberg testified on cross-examination that he saw Plaintiff only the one time, for thirty to forty-five minutes, and he could tell only "what my impression was from the day I saw him;" that if he had been treating Plaintiff over a period of time with more familiarity of Plaintiff's symptoms and complaints, that this "probably would" have had an effect on his opinion; and in fairness he could not express an opinion to the jury as to Plaintiff's present physical condition at the time of trial with reference to whether he is disabled. He further testified that on the one occasion when he saw Plaintiff, he was cooperative and gave no evidence of malingering or falsifying his complaints.

Our Supreme Court in *Houston Fire and Casualty Insurance Co. v. Dieter* (Tex.1966), 409 S.W.2d 838 at p. 841 said:

"The inquiry at the trial of a workmen's compensation case is the extent of incapacity of the injured employee *at that time.* It is the purpose of the Workmen's Compensation Act to afford compensation for incapacity for work *as it then exists.*" (emphasis supplied).

The only testimony in the record showing the extent of disability of Plaintiff at the time of trial is that of the Plaintiff himself and Dr. Kelley. The Plaintiff testified to serious disabling symptoms and complaints as hereinabove set out, which have persisted and have not improved for more than a year prior to trial, which conditions have been corroborated and confirmed by Dr. Kelley, who treated him for six months immediately preceding the trial. Dr. Kelley last saw him just four days before the trial started.

On the other hand we have the testimony of Drs. Gassler and Goldberg, who were furnished and paid by the Defendant-Appellee insurance company, both of which doctors were inclined to believe the Plaintiff's symptoms and physical problems were not serious. However, we do not believe the testimony of these Defendant's doctors is entitled to much weight, because neither of them had seen the Plaintiff for nine months before the trial, and neither of them could and did express any opinion concerning Plaintiff's condition at the time of trial. As stated, Dr. Goldberg had seen Plaintiff only one time for 30 to 45 minutes, and admitted that if he had seen him more and had been more familiar with his condition, that this probably would have affected his opinion. In short, the Defendant-Appellee's testimony concerning Plaintiff's extent of disablement at the time of trial is inconclusive, while that of Plaintiff-Appellant is definite.

For the above reasons we are of the opinion and hold that the jury's answers to special issues numbers 5, 6, and 7 are so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. *In re King's Estate,* supra. We accordingly reverse and remand the cause to the trial court for retrial on the merits.

REVERSED AND REMANDED.